Case Number 24-1427, Securities and Exchange Commission versus the Commonwealth Equity Services, LLC. At this time, would counsel for the appellant please introduce himself on the record to begin. I'm Tom Byrne on behalf of Commonwealth Equity Services. I would propose to reserve two minutes of my time in the puddle. You may have two minutes. May it please the Court, there are four questions that are addressed in our brief. What I'm going to try to do today is address the first two in this argument time and rely on our briefs for the second two, so I'm happy to answer questions about any of the four issues. I want to focus my attention to the two issues that have resulted in setting aside the judgment of the whole. The little context first before we get into those two issues, the first impression one might have of this case is what did Commonwealth do to possibly, what conduct could Commonwealth have engaged in that would lead to a $93 million sanction, a very severe sanction obviously. Did Commonwealth do something unlawful? No. Revenue sharing, which is the core of this case, is completely lawful and everybody agrees on that. Now, Commonwealth is an investment advisor, this is an Investment Advisor Act case, did Commonwealth fail? Could you curtail context? We're actually quite well prepared to get to the issues. It seems to me you've got a materiality issue and you have a disgorgement issue. Thank you, Your Honor, I can take a hint. I'll go ahead and get to the issues. The first issue I'd like to raise is causation. Is there a causal link between the violations that are charged and the gain to Commonwealth that is the subject of the disgorgement? And the answer is no. The main case there is the SEC's own decision in Robert. Very similar case involved disclosures about revenue sharing, same subject matter as this case. And there the SEC itself held that there was no basis for disgorgement where the evidence was that Robert would have received the same revenue sharing anyway, even if disclosures had been properly made. And the court, excuse me, the SEC held that $150,000 civil penalty was the appropriate sanction in that case. And it's worth noting that the disclosures there were less forthcoming than Commonwealth's series of disclosures over five years here. Are there any circuit level cases that explain what is required to establish that causal connection for disgorgement or is it Robert that you rely on? We rely on Robert, Your Honor. The many cases, including this court's recent decision in Navalier, I believe that's how it's pronounced, mentioned that a causal link is required but there's no circuit court level decision that goes into much detail about that. Now, there is the Montford, in the normal securities case, it's going to be relatively easy to demonstrate where there is a fraud or a violation that there's a causal link between the conduct and the gain to the defendant. Let's take the Navalier case itself. Navalier involved some defendants who claimed that they had this terrific investment program and had a great track record and advertised it. And investors were attracted to come and invest in it. And many did. And so it's easy to see when it turned out all of that was fraudulent, it's easy to see the connection between the accumulated gain and the unlawful conduct. Another case is Montford. I think the district court here says that causation is self-evident. That's correct, Your Honor. The district judge here went ahead and presumed causation. So from the perspective of investors or people who come in with this advising, are there reasons why some would pick the other investments? And what are those? Absolutely. The reasons are varied, Your Honor. But the share classes, almost all mutual funds nowadays have share classes. And the share classes have different economic rights and requirements. And some involve investment minimums, some have holding periods, some have other features that differentiate themselves. And they're intended to appeal to investors with a variety of profiles. So this is a regulated subject under Rule 18F3, I believe, of the SEC's rules. And so an investor with a long-term investment horizon who wasn't going to do a lot of trading would not be worried about transaction fees. But an investor who is an active trader or thinks he or she should be an active trader is concerned about avoiding transaction fees. So being in a fund with no transaction fees but maybe a higher expense ratio would be attractive to that person. Now, the SEC's official interpretation of the Advisors Act from 2019 explains all of this. And there's no general duty of an investment advisor to put customers or clients into lower cost share classes because of those very reasons I just mentioned. Can you give me just an example? I mean, suppose you... Let's make up a client. And he's buying in company X. And the advisor says, great. And he has now two choices. One, he can pay a transfer fee. Let's say that's $42. Or he can buy exactly the same thing and instead of not paying, he doesn't have to pay the $42, but he does have to pay a certain percentage of the overhead of the company. Is that right? He has to pay a certain kind of a fee year by year or month by month or something. Yes. Well, in a mutual fund, there's an expense ratio. And if you're buying a mutual fund and not shares of a company, you pay an overall... And it might be more than the $42. It might end up... In fact, it probably would. Well, it depends on how many times you incur that $42 charge. Oh, you mean sometimes... No, you just... Oh, well, suppose... Why would a person... Give me an example. Why would a person say, I want to run the risk of it being more expensive than $42? Why would he not say, okay, $42, that's it. That's the cheapest thing I can do. Why would he want not to do it? Investors change their minds. No, no, no. But I mean, give me a reason. You're my advisor. Give me a reason why I shouldn't just pay the $42. That's the cheapest thing to do. Well, it depends on your investment horizon. Are you going to sell everything you have the next day? How's the economy doing? Yeah, okay. Give me an example. What are your perceptions of the marketplace? I just want one example of where it will end up costing me less than $42 not to pay the transfer fee. Well, if you were in a higher cost mutual fund, you don't have any transfer fees. That would be one place you wouldn't incur one. Yeah, I mean, something in this case. Well, there was no specific customer testimony in this case, Your Honor. That's one of the major problems. Well, let's make up an example. You can do that. Just make one up. I'm just trying to understand it. Well, let me see if I understand the question, Your Honor. You would never want to incur... $42 is pretty cheap because if you don't pay the $42 now, you're going to pay on some kind of complicated percentage thing which nobody can understand. But you may end up paying more. Well, but you've locked yourself into a fund where you would end up paying $42 again and again. If you trade it. And so it could be more to do it that way. If you're going to trade and trade and trade and trade, you'll end up paying more. That's right. Okay. Now I got the example.  So turning to the question of materiality, if I may, to wrap up on causation, there was never any evidence by any investor that if just I had seen the few additional pieces of information, a few more specifics about the conflict here, then I would have changed my investment activity. Zero. Okay. So let me do this one. I'm sorry to do this to you, but I had a hard time understanding this. But you think there might be somebody out there in this big class of customers and he would not pay the $42. Why not? And you say, because I'm going to sell this thing every five minutes and I have all these $42 to pay. And so when the district judge you're saying said it was obvious, you say, of course it wasn't obvious. There are people who just pay, you know, that every five minutes they're selling it. There are such people. We have thousands and thousands. Have I got this right? Well, that's essentially the difference between the share of funds and the selection of the owner. Yes. Is it right that the judge must be wrong when she said it's obvious? Yes. Because it isn't obvious for the reason that I just said. It isn't obvious at all. Is that right? Yeah, I think so. Okay, got it. Thank you. So turning to the – wrapping up on causation. In the normal case – Sorry. I'm still on that. I understand that example. And so that is one example that I think perhaps isn't quite as obvious. Are there any other hypothetical clients that you can think of that would have a different reason to buy – To buy one share – Yeah, over the other. One share class over another? Because it seems most would buy the ones that aren't going to cost them more, right? Well, it really does depend, Your Honor, because it depends on your trading practices going forward in terms of your selection of which share class you'd like to be involved in. So that's the only difference? That's the only difference. Okay. They have investment minimums as well that you're not eligible for some if you don't put a minimum investment in. Sometimes those are waived. Sometimes they're not. But that's another difference between – But the real way there would be a cost difference or a difference that matters in terms of choice is if you are a person who wanted to trade a lot. In terms of immediate cost, that's right, Your Honor. Okay. Turning to materiality, the judge entered a summary judgment here against Commonwealth for an omission of particular details to be material. As we all know, there has to be a significant likelihood that it would significantly alter the reasonable investor's total mix of information. The Supreme Court has explained that's a prototypical fact question. In the Northway case, which we quote in the brief, the court went into great detail explaining just why. The court noted that even where the objective facts are the same, the inferences to be drawn from those facts when it comes to materiality require, quote, delicate assessments of those objective facts. The objective facts are just the starting point. And so, as this court has said many times, materiality in securities cases is ordinarily a jury question. And so it should have been here, that norm should have held here, and a jury trial held on the question of materiality, and it was error to grant summary judgment. So I see I'm running – My understanding is that the SEC claimed a jury trial under those circumstances. You can take advantage of the SEC's claim for jury trial. The case is a jury case. The fact that each of you, your client, and the SEC moved for summary judgment does not eliminate that jury trial request. The SEC has suggested that you waived your jury trial by not arguing, not using the word. Any material disputes of fact have to be decided by a jury until you move for reconsideration. I'm not sure that all of that amounts to a waiver. Could you talk about that? Well, Your Honor, the Commonwealth was very explicit that in its own motion for summary judgment, that if Commonwealth didn't get summary judgment, that there had to be a trial, that at the very least, there were numerous issues of material fact for trial. You never agreed it would be a case stated. Okay, so we do have the materiality issue right up front. On that question, again, the trial court seemed to think that it was perfectly obvious that after your client had disclosed that Commonwealth may receive some transaction fees back from the processor, that you had to say, we will receive transaction fees as to these particular stocks, which are in our preferred category. Of course, we're talking about hundreds of thousands of investors here, and some of them aren't interested in the preferred category. Some of them are in fidelity. It's a little hard to see why there isn't a fact question about whether all of those 100,000 investors would have considered this additional disclosure to be material. But the law on materiality, where you're talking about hundreds of thousands of investors, or at least tens of thousands, doesn't seem to be very well established. Can you give me any help on this? Well, Your Honor, again and again, the cases say, as you know, that materiality is ordinarily a jury question. So the materiality standard looks to a reasonable investor. And here, the question is about this missing additional information. And on that may versus will receive, it's a very important point, may receive, commonwealth maintained, was correct, because there were funds that didn't pay any revenue share. So the district court and the SEC insisted on using will receive, but the tension between using may receive or will receive versus the insistence by the SEC that disclosure be made of funds that don't pay revenue sharing is obvious. And that means there has to be a jury question here. Okay. Thank you. I'll reserve any remaining time I have. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the record to begin? Thank you, and good morning, Your Honors. And may it please the court, Paul Alvarez for the Securities and Exchange Commission. Your Honors, the final judgment against the commonwealth should be affirmed. Judge Lynch, you asked a question about materiality and why there wouldn't be a question of fact for a jury. And that goes, I think, right to Justice Breyer's question about the $42. You have to look at what was not disclosed here. And I'd like briefly to just remind the court what was not disclosed. First, there is no dispute of material fact that between 2014 and 2018, commonwealth failed to disclose to its clients the material fact and attended economic... No, no, no, no. ...that... You can't keep saying failed to disclose the material fact when what is at issue is materiality. We know they didn't disclose that certain funds, they would receive a fee out of... They did say, there may be, because we received some fees, a conflict of interest. You're on notice. There may be a conflict of interest. Your case is they should have said at least as to X funds. Did they have to identify them? We will receive? Well, the may versus will, I want to put that to the side for a second, and I will get to that. Okay. But the critical thing that they did not disclose to their clients is in effect with respect to the NTF program, right? There is no dispute they did not disclose anything about the TF program revenues that they received or that fidelity funds were not subject to the revenue-sharing agreement, and thus that there were attended economic conflicts of interest arising from those material undisclosed facts. But as to the NTF program, they did not disclose to clients that there were lower-cost share classes available within NTF funds that generated revenue for them, and thus that Commonwealth had economic self-interest. They had a conflict of interest that they made more money when their clients were in more expensive NTF share classes, and they made less money when their clients were in less expensive share classes, and that, the issue of price, is material. Is your argument that they had to disclose specifically the funds in which they were going to earn more money? No, they had to disclose. I think if you look at what they disclosed in March 2008, and we haven't disputed at this point that that was sufficient for this case. Okay. But if you look at the March 2018 disclosure, that discusses the existence of lower-cost share classes and tells the client that they have a conflict... Commonwealth has a conflict of interest here that they will make more money on more expensive share classes within the NTF program, and they will make less money within NTF share classes that cost clients less. And we know from other evidence that not all investors would have considered this important to them. We know that from how... Commonwealth didn't introduce any evidence at all... The SEC. The SEC introduced evidence.  Well, for one thing... Only one stockbroker who... No, not one, multiple stockbrokers who consistently said... multiple representatives who consistently said that cost was a critical factor to them. And I'm happy to cite... to what they said, but... Representative Michels, Buchholz, and Muscat stated that they were looking for the cheapest, most effective share class available. Cost matters a lot to me. Cost is important. I try to find the absolute lowest cost. The cheapest share class possible is what I'm looking for, and I don't recall transaction fees being an issue during that time. So the consistent, unrebutted evidence from the representatives here is that cost matters. And that makes sense, right, Your Honor? If you're looking at something to buy something, whether it's a stock or a shirt or a pair of shoes, and you Google that item, you will find a list of websites that will sell you that item. And the first thing that shows up is price. So... That's true. Please, no, no, no. There are thousands of customers. Yes. And there are maybe thousands of advisors. That work here. Maybe hundreds, anyway. And none of them, apparently, according to what I've read, none of these advisors knows anything about this. They don't know the Commonwealth, what money they're getting, or they just know what was disclosed initially. That's all. And yet, despite that, a lot of them seem to have advised their clients to buy the share in the class which ends up being more expensive. Which ends up being a little more expensive because they don't pay a transfer fee. They simply wait and pay a share each time of some kind of overhead calculation. Is that true? Well, no, that's not true. Number one, again, the only testimony from the representatives is that cost was the most important factor. Well, of course it is. But I mean, sometimes if that's... Why didn't anybody of these... Why didn't any of these advisors say, hey, pay a transfer fee. You'll end up with less money. On the other point about the transaction fees, the transaction fees are not relevant to the issue either of liability or of the disgorgement. When the... Why? Well, here's why. Because there are four categories of NTF funds with lower cost share class and lower cost share class availability. There were either clients that had contracts for no fees at all. There were representatives who absorbed the fees. There were the INTF program fees themselves which didn't charge transaction fees. And the final one was, as my friend alluded to, that there are clients who are on a buy and hold strategy. And as you alluded to in your question, Justice Breyer, they are not incurring transaction fees because they're holding long. All right. So all those people, so you get all those people. That's right. And those people should have done what? They should have paid a transaction fee? No. This isn't about what they should have done. This is about what Commonwealth should have disclosed. True disclosure. What will the action change? How will it change? The action would permit them to make an informed investment decision. Is there one person who would have made the same choice? On this record, no. But the representatives, this is an advisory, these are advisory accounts, Your Honor. They're representing the interests, the best interests of their clients, and there's no reason to think that the clients themselves would have any different understanding about what their investment strategy would be than the representatives. I can't get it. I can't get it. I mean, you're saying they should have used some extra words in their disclosure. If only they had done that, and then I ask you, if only they had done that, would there be some clients who as a result of their having done that would have changed the order of what to buy or what to sell, or its form? But that's a form of reliance, Your Honor, that the Commission is not required to show in enforcement actions here. I mean, you're going to, whether or not the failure to disclose a material conflict that was relied upon... I'm not saying it had to, but I mean... But you're asking me to, where's the evidence that someone relied upon this to their detriment? And the court... No, not really. I'm sort of asking, why didn't one of these independent advisors who know nothing about this situation, why didn't one of them at least say to a client, client, buy something different? Well, they did. Is there any evidence of that? Yes, there's evidence of that. The representative said, once I found out about this, I made the choice. I switched to the lower cost. And there's no evidence from Commonwealth rebutting that. So the uniform evidence here is that it's material. No, no. Representative Volkholz testified he was aware of lower cost share classes, at least as of November 2016, before these additional disclosures. But he nonetheless purchased a share class with a higher expense ratio because the difference between the two funds was negligible from his point of view, which is an example that bears out Justice Breyer's intuition. Sure. I think the question, again, is what a reasonable investor would consider important to making an investment decision. And the idea that there are lower costs share classes of the same fund, you are paying less for the same thing. Unless you trade a lot. Unless you trade a lot. If you trade a lot, you're not paying less. Well, and again, as I mentioned, Justice Breyer, if you trade a lot, that, again, most of the clients were in categories where they did not have transaction fees regardless of whether they traded a lot. So I want to push back on that a little bit. Okay. But the point is, was this important to a reasonable investor? And I think, by and large, the answer is absolutely yes. These are material conflicts of interest. These are economic conflicts of interest. There is no doubt that the existence of the revenue sharing agreement created an incentive for Commonwealth to place its clients and have its clients select and hold investments that made it more money. And that when, especially as to the NTF program, when they were invested in lower cost, to them, investments, Commonwealth made less money. And that economic incentive is exactly what the Supreme Court was getting at. But it's not Commonwealth that talks to the individual advisor. It's this broker. And the broker knows nothing about all this. Is that right? No, that's also not right. Commonwealth is a registered advisor. Commonwealth is the one that has the ultimate responsibility. And Commonwealth made that argument below thrice. And the court rejected it. And they're trying to foist responsibility on the representatives. No, no, I'm not interested in that. I'm not criticizing. I'm trying to understand this. And what really seems odd to me is you go to A, which costs you more, or B, which costs you less. And you're saying they're just the same. And Commonwealth benefited if you go to A. All correct, okay. So if only they had disclosed more, everyone, everyone, according to this damage remedy, would have gone to the cheaper one, B. And so you say, that's so surprising because they had all these independent investors who told them go to A. So there must have been some reason to do it. Your Honor, if only they had disclosed it, then everyone, everyone, would have had an opportunity to make an informed investment decision. And that gets to the heart of what the Supreme Court talked about in capital gains. And I'm just going to quote it here. An investor seeking the advice of a registered investment advisor must be permitted to evaluate the advisor's overlapping motivations through appropriate disclosure in deciding whether an advisor is serving two masters or only one, especially if one of those masters happens to be economic self-interest. That is exactly this case. Disclosure of conflicts of interest, as the Court held in capital gains, goes to the basic functions of an advisor. Congress enacted the Advisors Act to prevent just such misconduct. And my friends said that they didn't act unlawfully. They absolutely did, in violation of 206-2. And Congress said that you have to, in order to perform your basic functions, which is to provide competent, unbiased investment advice, an advisor either must eliminate or fully and fairly disclose the conflicts of interest that it has. And there is no dispute here that it did not disclose the conflicts of interest, the economic conflicts of interest it had for TF program and Fidelity. And there is no dispute that it did not disclose the conflict of interest relating to the existence of lower-cost share class alternatives. I'd like to just get some clarification. You say the Commonwealth, because it is a registered investment advisor, had these obligations to fully and fairly disclose. And that is the law. But as I understand this, Commonwealth itself did not advise individuals who were purchasing shares or mutual funds. Instead, there is an intermediate level of advisors who actually are advising the clients. So is the obligation to those advisors who are actually advising the investors, or is it to the investors? The obligation is to the investors. Commonwealth owes an obligation to its investors. The investors are the ones that are paying, sorry, to the clients. And the clients are the ones that are paying Commonwealth the advisory fees. They are bargaining for the fiduciary financial advice that they're supposed to be getting.  I'm sorry? They're purchasing, the investors are purchasing the shares, not on any advice from Commonwealth, but on advice from the advisors. Well, Commonwealth retains the discretion in all of these cases, right? They are still ultimately the authority. Now, Commonwealth does sort of farm out through the IARs, but ultimately it is Commonwealth's obligation as the investment advisor. And real quick, I see that my time is up, but I'd like to briefly touch on causal connection. Judge Montecavo, you asked whether there were circuit-level cases addressing causal connection with regard to whether or not you needed, sorry, client testimony to establish a causal connection. And the answer is yes, as this case, this Court's recent decision in the Navalier case, in Navalier, which we cited throughout our brief, addressed that question squarely and rejected it. It said that investor testimony was not required to establish a causal connection. What is required? Factually, that case is very different. So do you have... You can argue with me about that. I disagree. Do you have other circuit cases you want us to look at? Certainly, yeah. I mean, you know, I think the question is, you know, we cited a bunch of cases on page 49 of our brief. The standard for causal connection is whether there is a nexus between the proceeds that you're trying to disgorge and the fraud at issue. And as the D.C. Circuit described in First City, and that's at 890 F. Second at 1292, it said where the SEC can show the defendant's actual profits on tainted transactions, that at least presumptively satisfies the burden of showing a causal connection. And the cases that we cite to on page 49 of our brief uniformly show that within the context of advisors, where there are tainted transactions as a result of a failure to disclose a conflict of interest, that the profits from those tainted transactions satisfies, at least presumptively, the causal connection. And the defendants have not offered... Commonwealth has not offered anything to rebut that presumption here. Don't say... This is really a question for them, but you can see it too. But, look... Should I not answer it? No, no, you can. But the... As I understand this case now, which, as you can see, I've had a hard time with. No, it's a... I... Don't worry about that. The point, it seems to me, what the SEC is saying is, look, Commonwealth, you should have gone a little further in your disclosures, and what you should have done is explained that there's the same category of share or investment here, where you don't have to pay as high a transfer fee or fees that are related to that, and you would have gotten about the same thing. That's what they should have said. It's expense ratio, but... Whatever it's called, it's about the same thing.  Well, transaction fees are different than expense ratio. Okay, but I'm using the wrong words, which I've done throughout reading this, but there's A and there's B, and one's higher and one's lower, and they should have said more about the lower thing. And we're talking about the same fund here. Okay, okay, got that. Okay, so they should have done that because most people are very interested in cost. Then when it comes to the damages, they say, well, we look at the evidence here, and the only evidence we have in this case are four people who say they always look at cost. Now, given the record like that, it's obvious, the obvious that every single customer... I don't have to even decide that. I have to let the Commonwealth show that somebody would have done this anyway. Is that right? Have I got this right? Not quite. One, I push back on the idea this is damages. It's a scorchment. This is a profits-based remedy. We're trying to disgorge ill-gotten gains from Commonwealth from their fraud. Number two, there is not just evidence from the representatives, which, again, is unrebutted, talking about how important cost is, and I think, again, that is relatively self-evident, but in addition to that, there is the presentation from National itself in 2016 to Commonwealth in which they say, hey, listen, Commonwealth, we know that you have these high-expense share classes in the NTF program funds. There are lower-cost share classes within the same funds that cost the customer less, but if you put your customers in those, you're going to make less revenue. Just letting you know that. That's obviously important enough to warrant an entire presentation. I don't think it's a question of whether this is important. It certainly is important, and investors need to be able... I think a lot of what my friend is arguing here presumes that an investor has all the information in front of him or her to make the informed investment decision, and the undisputed evidence shows here that they did not. And lastly, on Robert, he mentioned Robert, and I'd like to quickly touch on that. That is, A, a commission decision, which is not binding here, but, B, as the district court found, there were factual distinctions between that case and this case which muddied the causal connection in that case, and specifically the issue in Robert was whether or not... Specifically, the issue in Robert was whether or not the failure to disclose a conflict of interest was sufficient... There was a causal connection between a failure to disclose a conflict of interest and a decision to go from Fund A to a completely different Fund B. In this case, the question is whether or not there is a failure to disclose affected a decision to go from share class within Fund A to share class within Fund B that costs less. While there may be myriad reasons to switch from Fund A or not switch from Fund A to Fund B, the only reason why you would switch within share class of the same fund is cost. That was not disclosed, and that's why Commonwealth violated 2062 of the Advisors Act. Unless the Court has any further questions, we would ask that the final judgment be affirmed. Thank you. Thank you. Thank you, Counsel. At this time, would Counsel for the Appellant please reintroduce himself on the record? He has a two-minute rebuttal. Once again, Tom Byrne for Commonwealth. It's important to remember that from the very beginning here, from 2014 on, Commonwealth disclosed that it was receiving revenue sharing and that revenue sharing and other fees and compensation it received from mutual funds presented a conflict because it might have an incentive to put them in investments that were more beneficial to Commonwealth. That was disclosed since 2014. The additional details and minutia that the SEC insisted on including had no effect whatsoever on anybody, and there's no evidence of that. That's not what they're saying. I think, if I get it right for the 19th time, sorry to say, look, they're saying what Commonwealth should have said. Is Mr. Smith typical? You can get exactly what you're buying here for less money. That's what they should have disclosed, and they didn't. And then, as far as damages are concerned, they say we look at the record, and all we have in this record is we have people who say cost is what matters, and we don't find anything else. Now, that is why I put my last question, which may have been a little lacking in the perfect coherence I would like, but there's something, you see, that you understand about those two arguments. Well, Your Honor, there's no duty to put investors in... The SEC says this. There's no duty to put investors in the lowest-cost share class every time and to tell anyone about it. And the mutual funds themselves create the lower-cost and the higher-cost share classes and all the share classes, and they put those facts in their prospectuses where they're disclosed. It's not Commonwealth's duty to disclose all that. Now, let me mention the talk about the three advisors who said that they put their customers or their clients in lower-cost share funds. Well, the fact is they didn't say they did that because of enhanced disclosures. They said they did it because they thought it was beneficial to them. Commonwealth wasn't concealing it from them, and Commonwealth, in 90-plus percent of the cases, isn't giving the advice to clients. Those independent investors are. That's better than 90% of the cases of the clients involved. So it's the tail wagging the dog to say that Commonwealth itself is giving a lot of advice here on that. And as far as other circuit cases, here's one to look at. We cited Montford against the United States. It's another SEC case. It's another case in which the SEC easily found customers to come in and testify that things would have been different if they had known the real facts. Here, what's the before and after? After the disclosures were compliant in December 2018, was there a stampede to lower-cost share funds? No, there's no evidence of that at all, and it was the burden of the SEC to come forward with that evidence, especially when they're asking for $93 million. So we ask that this judgment be set aside. Thank you. Thank you, Counsel. That concludes argument in this case.